UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JULIE ANN DAHLSTROM AND HEBA GOWAYED,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>        Defendant. | Case No. 22-cv-1165 (JMC) |

## MEMORANDUM OPINION

Julie Ann Dahlstrom and Heba Gowayed—two university professors—submitted a Freedom of Information Act request seeking information about a visa program. The professors eventually filed this lawsuit, challenging the adequacy of the effort made by the United States Citizenship and Immigration Service (or USCIS) to respond to their request. ECF 1. Because USCIS conducted a search reasonably calculated to uncover all responsive documents, the Court GRANTS the Government's motion for summary judgment.[1]

### I.    BACKGROUND

In the Trafficking Victims Protection Act of 2000, Congress "established a T nonimmigrant visa classification"—"colloquially known as the T visa"—"for certain victims of trafficking." 2 Charles Gordon et al., *Immigration Law & Procedure* § 28.01 (2025); ECF 29-1 at 1. Dahlstrom and Gowayed are professors at Boston University interested in the administration of that visa program. ECF 29 at 5. Their research "will inform both policy makers and the public of how this

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

program, which was intended to provide assistance to victims of human trafficking, was mishandled." *Id.* To that end, the professors submitted a FOIA request to USCIS in January 2022 asking for the following records:

    a. All denials of applications for T-1 nonimmigrant status issued between [] January 1, 2017 through December 1, 2021.

    b. All Requests for Evidence issued to T-1 nonimmigrant status applicants between January 1, 2017 and December 1, 2021.

    c. All Notices of Intent to Deny issued to T-1 nonimmigrant status applicants between January 1, 2017 and December 1, 2021.

    d. All Notices to Appear issued to applicants whose T-1 nonimmigrant application was denied between January 1, 2017 and December 1, 2021.

    e. All rejection notices involving applications for T-1 nonimmigrant status issued between January 1, 2017 through December 1, 2021.

    f. All Notices of Intent to Revoke issued to T-1 visa recipients between January 1, 2017 and December 1, 2021.

    g. Any statistical analysis of applications for T-1 nonimmigrant status completed from January 1, 2014 through December 31, 2016, including statistical analyses of rejections, Requests for Evidence ("RFEs"), or Notices of Intent to Deny ("NOIDS") of applications for T-1 nonimmigrant or statistical analyses of the time between submission and the issuance of a decision on an application for T-1 nonimmigrant status.

ECF 29-3 at 3.

Shortly thereafter, the professors asked USCIS to expedite their request. ECF 29-3. Then, in March, USCIS staff reached out to the professors to "discuss" their pending requests—which included not only the 2022 request, but two others submitted before that one which are not at issue here. ECF 18-1 at 411–12. Over the course of those conversations, USCIS asked the professors for "clarification" about "items a–f" of the "request": "[A]re you requesting the actual [documents] or are you only looking for statistical data?" *Id.* at 407. Dahlstrom replied, explaining that the professors were "amenable to requesting the statistical data for items (a)–(f) in place of the actual

documents, if it will allow the agency to respond more expeditiously." *Id.* at 406. The next day, USCIS granted the request for expedited treatment. *Id.* at 405.

When a month passed without USCIS releasing any records, the professors filed a motion for a preliminary injunction. ECF 5. But after the Government made a production, this Court denied that motion as moot. Min. Order 7/14/2022. The Government then proceeded to make additional productions, ECF 28-2 ¶¶ 77–78, and moved for summary judgment, ECF 28.

## II.  LEGAL STANDARD

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). When the adequacy of the search is challenged, the "agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015). Courts apply "a reasonableness standard to determine whether an agency performed an adequate search" and the inquiry is "heavily fact-dependent." *Id.* In conducting that inquiry, "the court may rely on a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched." *Id.* at 580–81. Such affidavits are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Id.* at 581.

## III.  ANALYSIS

The Government has submitted two declarations from Cynthia Munita to prove that it conducted an adequate search for records responsive to the FOIA request. Munita is the Associate Center Director and Chief FOIA Officer in USCIS's National Records Center FOIA Unit. ECF 18-1 ¶ 1. The first declaration details three similar FOIA requests submitted by the professors between 2020 and 2022. *Id.* ¶¶ 16, 21, 31. Only the last is at issue here. The declaration explains

that, after discussions with the Government, the professors agreed to accept a single response for the requested data, *id.* ¶¶ 42–43, and to accept "statistical data" in lieu of documents for items (a)–(f), *id.* ¶ 40. With the modifications, the FOIA request was granted expedited treatment. *Id.* ¶ 41.

The second declaration explains that the Government conducted three rounds of searching in response to the professors' request. ECF 28-4. The first was a search for statistical data responsive to items (a)–(g) of the request. *Id.* ¶¶ 15, 18. The office within USCIS responsible for "data collection and preservation" handled this search. *Id.* ¶ 17. It believed that much of the data could be found in a database called CLAIMS 3, while information about notices to appear—item (d) of the professors' request—would be found in a separate database. *Id.* ¶ 18. "[T]o search for broad data" in the CLAIMS 3 database, "an analyst must write code that is applied to the database." *Id.* ¶ 20. So the Government tasked an analyst with designing code to seek "each category of information sought" in "items (a) through (c) and (e) through (g)"—excluding only item (d) because that information was stored elsewhere. ECF 28-4 ¶ 24. For the data requested in (d) about the notices to appear, an analyst searched the appropriate database using the term "I-914 T NI Status"—the I-914 is the form used to apply for a T visa, *see* ECF 28-2 14 n.2—along with a date filter to narrow the results to the requested information. ECF 28-4 ¶ 26.

The second round of searching targeted any statistical analysis responsive to item (g) of the request. ECF 28-4 ¶ 28. For this search, the Government turned to an office that "performs research and analysis on immigration issues and program evaluations," as well as a different office that adjudicates "applications for T-1 nonimmigrant status." *Id.* ¶¶ 31–32. The first office searched an internal collaboration network used by its staff, along with shared drives where staff store files and staff email accounts. *Id.* ¶¶ 34–35. The second office similarly searched its shared drive, along with the personal hard drives and email inboxes of staff that "may [have] possess[ed] requested

4

information" and the office's "public-facing website." *Id.* ¶¶ 36–37. The office searched by using "terms common to the T-nonimmigrant program." *Id.* ¶ 37. Finally, this office also tasked one of its subdivisions—the one that "has jurisdiction over most victim-related petitions and applications filed with USCIS, . . . includ[ing] victims of human trafficking"—with conducting similar searches. *Id.* ¶¶ 38–39.

The third, and final, round of searching took place after the Government had produced records from the first two rounds and had appeared before this Court at a hearing on the professors' motion for a preliminary injunction. ECF 28-4 ¶ 42. "[W]hile compiling information to substantiate [its] search in support of [its] summary judgment motion," the Government learned that one component of USCIS may have "additional potentially responsive records." *Id.* The Government therefore tasked that component with "conducting a supplemental search." *Id.* ¶ 43. That search was, in part, focused on item (d) of the FOIA request, and therefore was looking for data about notices to appear. *Id.* ¶ 44. To that end, the Government had a staff member familiar with the relevant office's file organization system search the two folders where all notice to appear "tracking documents" are stored. *Id.* ¶¶ 44–45. Knowing that each of the "tracking documents" is named with the dates "of the segment of time tracked," the staff member looked through the two folders for files with titles that fell within the FOIA request's date range. *Id.* ¶¶ 45–46.

When conducting the third search, the Government also looked for additional records responsive to the professors' request for information about the rejection of visa applications. ECF 28-4 ¶ 47. Staff searched two internal systems used to track rejections. *Id.* ¶¶ 48–51. This search was done by filtering the data to find rejections in the date ranges requested. *Id.* ¶¶ 49, 51.

The records located in all three searches were handed over to the professors. ECF 28-4 ¶¶ 24, 27, 40–41, 52–53. The Government's declarant testifies that all the appropriate locations

were searched and that the search was reasonably calculated to identify responsive records. *Id.* ¶ 54. But the professors complain that the search was inadequate for three reasons: the Government should have but did not use search terms when searching some of the databases and should have used different search terms to query other databases; the Government should have searched USCIS's Freedom of Information Act Immigration Records System database; and the Government misinterpreted the professors' request for "statistical data" and therefore has not searched for everything requested. ECF 29 at 6, 11, 13. None of those arguments suggest there was anything inadequate about the Government's search.

### A. The professors' various arguments about search terms do not cast doubt on the adequacy of the Government's search.

The professors first complain that USCIS searched some of the databases without using the professors' preferred search terms. *See* ECF 29 at 10–13. That objection ignores much of the Government's detailed explanation about the steps it took to search. For example, the professors' lead argument is that the Government did not use search terms when searching the CLAIMS 3 database. *See id.* at 10. But the Government's declarant explained that searching "for broad data" in that database requires "writ[ing] code that is applied to the database." ECF 28-4 ¶ 20. The Court does not understand, and the professors have not explained, how it could be unreasonable for the agencies to search that database using the required method, rather than by using "search terms"—as the professors prefer, ECF 29 at 11—which apparently would not have worked.

The professors' complaints about how the Government searched in other locations fare no better. They insist that USCIS needed to use search terms when locating data about notices to appear, instead of searching manually through electronic folders. ECF 29 at 12. But the Government explained that it had a staff member familiar with USCIS's system for tracking these notices search the relevant places using the standard file naming convention as a search tool. ECF

6

28-4 ¶¶ 44–46. There is no reason to think search terms were needed when the staff member was able to review the relevant files, which were organized by date, to identify those that fell within the requested date range. *See James Madison Project v. DOJ*, 267 F. Supp. 3d 154, 160–61 (D.D.C. 2017) (rejecting argument that search terms were required where agency relied on individuals with personal knowledge of records). So too with the search of two databases which was done by filtering spreadsheets. *See* ECF 28-4 ¶¶ 49, 51. Other than their bare and conclusory demand for search terms, the professors offer no reason to think that method was not "reasonably calculated to uncover [the] relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007).

The only supposed evidence that the professors marshal in support of their claim that the absence of search terms rendered the search inadequate are what they call "discrepancies" between the data handed over in the Government's two productions. ECF 29 at 6. Those "discrepancies," however, do not suggest that there was anything wrong with the Government's search. For one, the Government readily admits that it conducted "a supplemental search" for additional records after its first production because it believed it might have "additional potentially responsive records." ECF 28-4 at 15. There is nothing suspect, then, about the fact that the second production identified additional records not found in the first one. *See* ECF 29 at 5–6 (identifying additional records produced in August production). The "supplemental search" was designed to do exactly that. More fundamentally, the professors ignore that "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003). That the first two rounds of searching did not identify every single responsive record and that the third round led to the discovery of additional records therefore does not cast doubt on the adequacy

of the methods used. *See Meeropol v. Meese*, 790 F.2d 942, 952–53 (D.C. Cir. 1986) ("[A] search is not unreasonable simply because it fails to produce all relevant material.").

At bottom, the professors' argument is that, as a matter of law, "[f]ailing to use search terms" renders a search inadequate. ECF 29 at 12. But the "adequacy of an agency's search is measured by a standard of reasonableness and is dependent upon the circumstances of the case." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990). In applying that standard, "it [is] inappropriate for [a] court to mandate a bright-line set of steps for any agency to take." *Schrecker v. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003). Indeed "FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the courts should attempt to micro manage the executive branch." *Id.* For all of these reasons, the Court declines to adopt here the professors' proposed categorical rule that search terms are always required. Instead, it applies the long-settled rule that an agency "must conduct a search reasonably calculated to uncover all relevant documents" in light of the "circumstances of the case," and concludes USCIS did as much here. *Truitt*, 897 F.2d at 542.[2]

For all the same reasons, the professors cannot undermine the adequacy of the search by pointing to search terms that they wish the agencies would have used in place of the ones actually used. *See* ECF 29 at 11–12 (protesting that USCIS did not "use [the] search terms found in Request

---

[2] The professors suggest that two D.C. Circuit cases have held that search terms must be used to perform an adequate search. *See* ECF 29 at 10 (citing *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321 (D.C. Cir. 1999), and *Reporters Comm. for Freedom of Press v. FBI*, 877 F.3d 399 (D.C. Cir. 2017)). Neither so holds. In the first, the court merely applied the settled rule that an agency must adequately prove that its search "was reasonably calculated to uncover all relevant documents" and held that the agency's search there was flawed given its "failure to search" a location it "kn[ew]" could "contain responsive documents." *Valencia-Lucena*, 180 F.3d at 327. Nothing in the court's decision turned on the use, or lack thereof, of search terms. *Reporters Committee for Freedom of Press* gets a bit closer to the mark. The court there did identify as the "principal flaw" in the agency's declaration its "failure to set forth the search terms and the type of search performed." 877 F.3d at 403. But that flaw was meaningful, and precluded summary judgment for the agency, because the affidavit as a whole "contain[ed] no information about the search strategies of the agency components charged with responding to [the] FOIA request." *Id.* Unsurprisingly, an agency's complete failure to explain how it searched will result in the agency failing to carry its burden of proving an adequate search. Nothing in *Reporters Committee for Freedom of Press*, however, suggests that an agency that *has* explained how it searched, but simply opted for a different method than the use of search terms, has not met its burden under the statute.

(g)" and asking the Court to "order [USCIC] to work with" the professors "in formulating appropriate search terms"). A FOIA requester "cannot dictate the search terms for his or her FOIA request." *Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015).

### B. The Government did not need to search the FIRST database.

The professors next contend that USCIS needed to search its FOIA Immigration Records System (what the agency calls FIRST). ECF 29 at 15–16. FIRST is an electronic case management system used "to create, control, and process all incoming FOIA/Privacy Act requests." ECF 18-1 ¶ 11. As part of the search in this case, potentially responsive documents from other locations were uploaded to FIRST for processing. *Id.* ¶ 46. After the documents were uploaded, USCIS determined that a federal statute—8 U.S.C. § 1367—barred their disclosure. ECF 28-4 ¶ 12. That law limits the disclosure of documents related to applicants for T visas. *See* 8 U.S.C. § 1367(a)(2). A statutory exception, however, allows the release of "statistical materials which do not disclose the information reported by, or on behalf of, any particular" applicant. 13 U.S.C. § 8(b); *see* 8 U.S.C. § 1367(b)(1). "[I]n a good faith attempt to respond" to the professor's FOIA request, USCIS therefore set out to try and search for the information in a "statistical" format that could lawfully be disclosed pursuant to that exception. ECF 28-4 ¶ 13; *see also id.* at 19 (USCIS informing the professors that a "renewed search for responsive records was required as the initial records were formatted" in a manner that that could not be disclosed because of 8 U.S.C. § 1367).

The professors nowhere suggest that section 1367 does not bar disclosure of the records USCIS uploaded to FIRST. Indeed, they implicitly concede the opposite, disclaiming any request that the Government "produce the documents in the FIRST database." ECF 29 at 16. Instead, the professors ask that a search be conducted of the FIRST database to "count" the number of relevant documents in the database, apparently in an effort to resolve the "discrepancies" the professors have identified. ECF 29 at 6. But that ask goes beyond what FOIA requires. The professors are not

9

requesting the records in the FIRST database, *see* ECF 29 at 16, but instead are demanding that the Government "answer a question" about those records—how many of them are there? *Judicial Watch, Inc. v. Dep't of State*, 177 F. Supp. 3d 450, 456 (D.D.C. 2016), *aff'd* 681 F. App'x 2 (D.C. Cir. 2017). "A question is not a request for records under FOIA," *id.*, so USCIS's failure to analyze the records in the FIRST database in no way undermines the adequacy of its search. *See Krohn v. DOJ*, 628 F.2d 195, 198 (D.C. Cir. 1980) (an agency "cannot be compelled to create" new records "to produce the data, information [, or] statistics . . . requested").

### C. The Government did not need to search for "statistical analysis" responsive to items (a)–(f).

Finally, the professors argue that USCIS's search was inadequate because the agency searched only for "statistical data," not "statistical *analysis*," responsive to items (a)–(f) of their request. ECF 29 at 17. Recall that in March 2022, the professors were asked if they were "requesting the actual" documents "or [were] looking for statistical data" for "items a–f o[f] [the] request." ECF 29-4 at 2. The professors responded that they were "amenable to requesting statistical data for items (a)–(f) in place of the actual documents, if it w[ould] allow the agency to respond more expeditiously." *Id.* at 3. The parties agree that this exchange modified the original FOIA request from actual documents to "statistical data." They dispute, however, the meaning of "statistical data." *See* ECF 28-1 at 21–22; ECF 29 at 17. The professors maintain that "statistical data . . . include[s] statistical analysis," so the Government needed to search for that analysis. ECF 29 at 17. The Government counters that it reasonably understood the modified request to be seeking only data (not analysis of that data).

The Government has the better of this argument. USCIS was "bound to read [the FOIA request] as drafted, not as . . . [the professors] might wish it was drafted." *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984). That applies with equal force to the "narrowed request" that the

10

professors "agreed to" after the Government sought "clarification." *Kenney v. DOJ*, 603 F. Supp. 2d 184, 189 (D.D.C. 2009); *Wilson v. U.S. Dep't of Trans.*, 730 F. Supp. 2d 140, 152 (D.D.C. 2010). The request as narrowed sought two types of information: "statistical data" for items (a)–(f), and "statistical analysis" for item (g). ECF 29-3 at 3; ECF 29-4 at 2. Giving force to the "plain language" of that request, *Machado Amadis v. DOJ*, 388 F. Supp. 3d 1, 17 (D.D.C. 2019), USCIS reasonably understood the professors to be asking for two different types of information—underlying data ("statistical data") and studies of that data ("statistical analysis"). *See Wallick v. Agric. Mktg. Serv.*, 281 F. Supp. 3d 56, 68 (D.D.C. 2017) ("Agencies must interpret FOIA requests liberally and reasonably, but they need not extend the meaning of the request to include things not asked for.").

\*   \*   \*

Because the Government has sufficiently demonstrated that it conducted a reasonable search, the Court GRANTS its motion for summary judgment.

**SO ORDERED**.

JIA M. COBB
United States District Judge

Date: October 7, 2025